In the Matter of Steven James FOSTER.

No. 10SA89.

Supreme Court of Colorado,
En Banc.

May 23, 2011.

1246

Office of the Attorney Regulation Counsel, Kim E. Ikeler, Assistant Regulation Counsel, Denver, Colorado, Attorneys for Complainant/Appellee.

Law Offices of Gary S. Cohen, Gary S. Cohen, Denver, Colorado, Attorneys for Respondent/Appellant.

Justice RICE delivered the Opinion of the Court.

In this original proceeding in discipline, respondent/appellant attorney Steven James Foster appeals the orders of the Presiding Disciplinary Judge ("PDJ") and disciplinary Hearing Board ("Board") sanctioning Foster for allegedly filing a frivolous appeal and engaging in conduct prejudicial to the administration of justice during the course of a protracted pro se post-dissolution litigation campaign against his now ex-wife, Sherrie Nunn.

Upon review, we reject the Board's conclusion that an attorney's First Amendment right to petition pro se must unilaterally give way to the Colorado Rules of Professional Conduct. We hold that the Board's findings—which indicated that the substantial majority of Foster's conduct was both objectively non-frivolous and subjectively motivated primarily by a genuine desire to obtain favorable legal relief—do not support the Board's ruling that Foster's conduct was not protected by the First Amendment. We further conclude that the PDJ erred by failing to require the complainant/appellee Office of Attorney Regulation Counsel ("OARC") to make a heightened showing on summary judgment that Foster's conduct was not protected by the First Amendment as required by *Protect Our Mountain Environment v. District Court*, 677 P.2d 1361 (Colo.1984) (*"POME"*).

Nevertheless, we find that Foster's claims in his sixth appeal of bias by a district court judge were so wholly duplicative of claims made and rejected in his fifth appeal that Foster cannot have had a subjectively proper motivation for making them. Thus, we conclude that Foster's bias claims in his sixth appeal constituted sham litigation unprotected by the First Amendment.

Accordingly, we affirm the determination of the Board that Foster violated Colorado Rules of Professional Conduct 3.1 and 8.4(d) by making frivolous bias claims during his sixth appeal, but reverse the remainder of the Board's determinations of misconduct. We accordingly remand to the Board for a redetermination of the appropriate sanctions

for Foster's misconduct in asserting the bias claims.

## I. Facts and Procedural Posture

Foster and Nunn married in 1991, the same year Foster was admitted to practice law in Colorado. The marriage later began to deteriorate, and Nunn filed for dissolution in 1999.[1]

### A. Foster's Underlying Litigation Against Nunn

Initially represented by counsel, Foster stipulated to temporary orders regarding various parenting issues. Foster's lawyer then withdrew from the case, and Foster proceeded pro se into a lengthy post-dissolution litigation campaign against Nunn, centering on the valuation of marital property, parenting decisions, and a host of other issues. The register of actions in the district court spans some six-hundred and thirty transactions over the past twelve years. Foster also initiated probate, civil, and criminal proceedings against Nunn, and filed nine appeals with the court of appeals and several petitions for certiorari with this Court between 1999 and 2007.

### B. The OARC's Investigation

In 2007, Nunn requested that the OARC investigate Foster, contending that his lengthy post-dissolution litigation against her constituted misconduct. After an investigation, the OARC recommended in 2008 that the Attorney Regulation Committee ("ARC") approve formal charges against Foster for violating Colo. RPC 3.1 (bringing a frivolous action) and Colo. RPC 8.4(d) (engaging in conduct prejudicial to the administration of justice). The ARC apparently authorized the OARC to file the charges, and the OARC did so.

### C. Foster's Motion for Summary Judgment

Foster filed a motion for summary judgment in the disciplinary proceeding, alleging

that his litigation against Nunn was protected by his First Amendment right to petition. Foster further argued that the OARC bore the burden of showing that his litigation was not protected by the First Amendment under the framework articulated by this Court in *POME*.

The PDJ held that *POME*, decided in the context of a civil abuse-of-process action, is inapplicable in attorney discipline proceedings. The PDJ reasoned that the underlying First Amendment concerns of *POME* are sufficiently vindicated by preliminary steps in disciplinary proceedings to obviate the applicability of the *POME* framework in the context of attorney discipline. The PDJ concluded that a full hearing would be necessary to determine whether Foster's litigation was in fact protected by the First Amendment, and denied Foster's motion.

### D. Foster's Disciplinary Hearing

After a hearing, the Board concluded that Foster violated Colo. RPC 3.1 and 8.4(d) and imposed sanctions accordingly. The Board entered findings of fact regarding Foster's nine appeals to the court of appeals and concluded that his sixth appeal was frivolous in violation of Colo. RPC 3.1 and 8.4(d) and that the remainder of his activity, though admittedly non-frivolous, reflected a desire on Foster's part to vex and harass Nunn in violation of Colo. RPC 8.4(d), notwithstanding his genuine belief that his arguments provided him with a legitimate basis to secure favorable relief.

#### 1. Findings of Fact

The Board entered the following specific findings of fact:

1) The Board did not find clear and convincing evidence that Foster's first appeal,[2] in which he was partially victorious, was frivolous or prejudicial to the administration of justice.

---

1. *In re Marriage of Foster*, No. 99DR372 (Boulder Cnty. Dist. Ct., filed Mar. 26, 1999).

2. *In re Marriage of Foster*, No. 00CA1553, 2002 WL 31122782 (Colo.App. Sept. 26, 2002) (not selected for official publication), *cert. denied*, No. 02SC770 (Colo. Apr. 21, 2003).

2) The Board found that Foster's second appeal,[3] in which he was again partially victorious, was neither frivolous nor prejudicial to the administration of justice, but found that the appeal "demonstrate[d] [Foster]'s level of litigiousness," that Foster "contributed to the lack of cooperation that might have resolved [the case] without further litigation," and that Foster's conduct was "contrary ... to the just, speedy, and inexpensive resolution of civil disputes."

3) The Board agreed with the court of appeals' specific holding that Foster's third appeal[4] was neither frivolous nor groundless, and found that the appeal was not prejudicial to the administration of justice. The Board nevertheless noted that the appeal was "yet another instance where [Foster] appealed a district court's order entered within its sound discretion."

4) The Board found that Foster's fourth appeal,[5] stemming from a civil complaint against Nunn for converting funds from their daughter's bank account,[6] was appropriately filed. The Board nonetheless found that the decision to file the civil complaint while issues surrounding the bank account were pending in the probate court was "consistent with [Foster]'s level of litigiousness as well as his efforts to find a tribunal that would agree with his assertion that Nunn wrongfully removed the funds."

5) The Board did not find clear and convincing evidence that Foster's fifth appeal[7] was frivolous or prejudicial to the administration of justice, but noted that "the underlying facts in th[e] appeal demonstrate [Foster] was continuing to focus more upon controlling Nunn than advancing claims in good faith."

6) The Board found by clear and convincing evidence that Foster's sixth appeal[8] was frivolous and, "given the frivolousness of [the] appeal, [that Foster] was more interested in vexing Nunn than advancing arguments ... in good faith." The Board also noted that "as [Foster's] legal arguments wore thin, his motivation for continuing the litigation became clearer."

7) The Board found Foster's seventh appeal[9] and the underlying litigation "troublesome," and acknowledged that the court of appeals deemed the appeal frivolous. The Board, however, noted that the OARC had earlier given Foster a letter explicitly declining to prosecute Foster for the appeal and noting that there was insufficient evidence to prove that the appeal was frivolous. Accordingly, the Board found that Foster "initiated [the] appeal with the good faith belief that he was not violating the Colorado Rules of Professional Conduct."

8) The Board found that underlying statements by the district court in Foster's eighth appeal[10] "corroborate[d the Board's] findings that [Foster] was extremely litigious throughout eight years of post-dissolution litigation," but heard no evidence on the resolution of the

**3.** *In re Marriage of Foster,* No. 01CA0025, 2002 WL 31122787 (Colo.App. Sept. 26, 2002) (not selected for official publication), *cert. denied,* No. 02SC771 (Colo. Apr. 21, 2003).

**4.** *In re Estate of Foster,* No. 01CA0218, 2002 WL 1814066 (Colo.App. Mar. 14, 2002) (not selected for official publication), *cert. denied,* No. 02SC220 (Colo. Sept. 9, 2002).

**5.** *Foster ex rel. Foster v. Nunn,* No. 01CA1581, 2002 WL 31835531 (Colo.App. Dec. 19, 2002) (not selected for official publication).

**6.** *Foster ex rel. Foster v. Nunn,* No. 01CV46 (Boulder Cnty. Dist. Ct., filed Jan. 15, 2001).

**7.** *In re Marriage of Nunn,* No. 04CA0710, 2005 WL 3216240 (Colo.App. Dec. 1, 2005) (not selected for official publication), *cert. denied,* No. 06SC156, 2006 WL 1688278 (Colo. May 22, 2006).

**8.** *In re Marriage of Nunn–Foster v. Foster,* No. 05CA1961, 2007 WL 2670426 (Colo.App. Sept. 13, 2007) (not selected for official publication).

**9.** *In re Marriage of Nunn–Foster,* No. 06CA0114, 2007 WL 2670291 (Colo.App. Sept. 13, 2007) (not selected for official publication), *cert. denied,* No. 07SC1008, 2008 WL 542128 (Colo. Feb. 25, 2008).

**10.** *In re Marriage of Foster,* No. 07CA1203 (Colo. App., dismissed Nov. 21, 2008).

appeal itself and declined to find that the appeal was frivolous or prejudicial to the administration of justice.

9) The Board made no findings with respect to Foster's ninth appeal,[11] which the court of appeals dismissed as untimely.

## 2. Conclusions of Law and Sanctions

The Board concluded that Foster's sixth appeal constituted a violation of Colo. RPC 3.1 and 8.4(d). Additionally, the Board found that Foster's aggregate conduct over the course of the litigation, viewed as a whole, had a cumulative effect prejudicial to the administration of justice in violation of Colo. RPC 8.4(d). The Board also rejected Foster's First Amendment defense, holding that his "freedom of speech and access to the courts ... do not immunize him from the application of the Colorado Rules of Professional Conduct." The Board suspended Foster from practicing law for a year and a day, all but ninety days stayed upon the successful completion of a two-year probation period, and ordered him to pay the costs of the disciplinary proceedings. Foster appealed the Board's imposition of sanctions and the PDJ's denial of his motion for summary judgment to this Court.

## II. Analysis

■ Foster disputes the Board's imposition of sanctions on several substantive and procedural First Amendment grounds. As the OARC concedes, it is well-accepted that an attorney cannot be disciplined for conduct protected by the First Amendment. *E.g., In re Green*, 11 P.3d 1078, 1083 (Colo.2000) (citing *In re Primus*, 436 U.S. 412, 432–33, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *Bates v. State Bar*, 433 U.S. 350, 355, 365, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)) (additional citations omitted).

■ In its decision, however, the Board ruled that attorneys' First Amendment protections "do not immunize [them] from the application of the Colorado Rules of Professional Conduct," intimating that attorneys may in fact be disciplined for conduct pro-

tected by the First Amendment. We categorically reject this conclusion. The U.S. Supreme Court plainly stated in *NAACP v. Button* that "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." 371 U.S. 415, 439, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citing *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959); *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Konigsberg v. State Bar*, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957)). Moreover, the rights protected by the First Amendment are at the very heart of conduct protected against regulatory infringement. *See Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961) ("[R]egulatory measures ..., no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights."), *quoted with approval in Button*, 371 U.S. at 439, 83 S.Ct. 328.

■ Because the Board's decision implicates questions of constitutional fact and law, we must evaluate de novo whether the proceedings below properly afforded Foster the substantive and procedural protections of the First Amendment. *See Kuhn v. Tribune–Republican Pub. Co.*, 637 P.2d 315, 318 (Colo. 1981) (citations omitted). We begin with a survey of the First Amendment right to petition both generally and in the context of attorney discipline, then turn to its application in this case.

### A. The First Amendment Right to Petition

■ The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." Under the Fourteenth Amendment to the United States Constitution, the First Amendment right to petition cannot be infringed by state government. *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 221–22 & n. 4, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (citing

**11.** *In re Marriage of Foster,* No. 07CA2334 (Colo. App., dismissed May 2, 2008).

*N.Y. Times v. Sullivan,* 376 U.S. 254, 276–77, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

### 1. The Right to Petition by Litigation

■ Litigation is one of the essential mechanisms by which citizens can exercise their right to petition. *See Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Button,* 371 U.S. at 429–30, 83 S.Ct. 328. Thus, the right of citizens to access courts of law to resolve disputes is a fundamental tenet of the First Amendment, one of our most treasured liberties under the Bill of Rights, and a cornerstone of our republican form of government. *POME,* 677 P.2d at 1364–65 (quoting *Ill. State Bar Ass'n,* 389 U.S. at 222, 88 S.Ct. 353; *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)).

■ The great power to hail a fellow citizen into court, however, comes with great responsibility, and should only be exercised to facilitate the fair and efficient resolution of a legitimate legal dispute. The misuse of litigation as a weapon to baselessly harass, vex, or spite an opponent offends the First Amendment by disrupting the efficient operation of the court system and misappropriating judicial resources necessary for legitimate litigants to resolve their disputes. *See Krystkowiak v. W.O. Brisben Cos.,* 90 P.3d 859, 865 (Colo.2004).

### 2. The Sham Exception to the Right to Petition

The U.S. Supreme Court recognized this principle in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* holding that petitioning activity can be regulated by antitrust law if it is a "mere sham." *See* 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *United Mine Workers v. Pennington,* the Court contracted the "mere sham" doctrine, holding that petitioning activity cannot be regulated simply because it is motivated by a subjectively improper purpose, but must also be objectively baseless. *See* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Subsequent holdings developed the *Noerr/Pennington* doctrine into what has been deemed the "sham exception," which denies First Amendment right-to-petition protection for sham litigation in other areas of law. *POME,* 677 P.2d at 1366. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* the U.S. Supreme Court articulated a two-prong definition of the term "sham," requiring that litigation be both (1) objectively baseless and (2) based on a subjectively improper motive to fall outside the umbrella of First Amendment protection. 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). This Court expressly adopted nearly identical principles in *POME, see* 677 P.2d at 1369, and reaffirmed them in *Krystkowiak, see* 90 P.3d at 865.

### 3. The *POME* Procedural Limitations on the Sham Exception

■ Recognizing that indiscriminate assertions of the sham exception could have a chilling effect on legitimate litigation, this Court in *POME* articulated additional due process protections designed to ensure the viability of the right to petition. 677 P.2d at 1368–69. Under the *POME* framework, a defendant in a civil abuse-of-process action may file a pre-trial motion to assert a First Amendment right-to-petition defense. *Id.; Krystkowiak,* 90 P.3d at 862, 865. The burden for surviving the motion automatically shifts to the plaintiff, who must make a sufficient showing to permit the court to reasonably conclude that the defendant's underlying lawsuit was not protected by the First Amendment. *POME,* 677 P.2d at 1368–69.

While the right to petition, the sham exception, and the requirements of the *POME* framework are well-recognized in the context of civil litigation, we have never comprehensively addressed their applicability in the context of attorney discipline for pro se litigation conduct, to which we now turn.

### B. The Substance and Procedure of the Right to Petition in the Context of Attorney Discipline

■ We begin with the well-established principle that attorneys are entitled to the same level of First Amendment protection as non-attorneys unless a state has a compelling

interest in regulating some aspect of their speech or conduct. *Button,* 371 U.S. at 439, 83 S.Ct. 328 (quoting *Bates v. City of Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960)). The PDJ, the Board and the OARC reason that the state has several such interests in eliminating, or at least limiting, an attorney's First Amendment right to petition via pro se litigation.

More specifically, those lines of reasoning include: (1) that an attorney's pro se conduct is unprotected by the First Amendment because of the state's interest in regulating those practicing law in a representative capacity; (2) that an attorney's conduct should be subject to a more expansive definition of "sham" because of the state's interest in preventing well-trained attorneys from ensnaring hapless lay opponents in technically non-baseless but unreasonable litigation; and (3) that attorneys should not be entitled to the procedural protections of *POME* in disciplinary proceedings because the First Amendment concerns underlying the *POME* framework are sufficiently vindicated by other safeguards in disciplinary proceedings. We find these arguments unpersuasive.

### 1. The State's Interest in Regulating Representative Conduct by Attorneys

The Board reasons that an attorney has no First Amendment right-to-petition protection when acting in a representative capacity— even if the attorney is representing himself. The Board noted that "[i]t matters not in our analysis that [Foster] represented himself rather than a client. [Foster] still must follow the rules normative principles [sic] expressed [in the Rules of Professional Conduct] when litigating a matter in court." That line of reasoning, however attractive, rests on a misunderstanding of the state's actual interest in regulating representative conduct.

 In *People v. Shell,* this Court recognized that the First Amendment right to petition does not permit unlicensed individuals to represent others in legal matters. 148 P.3d 162, 174 (Colo.2006) (citing *Unauthorized Practice of Law Comm. v. Grimes,* 654 P.2d 822, 824 (Colo.1982); *Turner v. Am.*

*Bar Ass'n,* 407 F.Supp. 451, 478 (D.Tex. 1975)) (additional citations omitted). At the core of *Shell* is a recognition that the right to petition is *personal* and does not extend to petitioning activity on behalf of others. *See id.* The rationale for precluding First Amendment protection for representative activity on behalf of others is to "protect the public from unqualified individuals who charge fees for providing incompetent legal advice" by requiring would-be attorneys to be admitted to the bar and assume professional accountability for offering legal services. *Grimes,* 654 P.2d at 826.

The state's interest in protecting clients from incompetent representation is not implicated in the same way, however, by pro se litigation conduct. *See Turner,* 407 F.Supp. at 478 ("For the Court to recognize the right of a defendant to defend himself in his own person is one thing. It is quite another thing to allow him to bring unqualified and untrained people off the street to conduct his defense."). All pro se petitioning activity by its very nature involves representation, albeit of the petitioner's own self. *See Black's Law Dictionary* 1341 (9th ed. 2009) (defining "pro se"). Expanding the personal limitation on the right to petition to all representative petitioning activity would deny right-to-petition protection not just to attorneys litigating pro se, but to all pro se litigants. To do so would hamper pro se litigants' right of access to the courts solely for the sake of protecting them from their own incompetence. And an attorney, more so than any other pro se litigant, is likely to understand that he will be held fully accountable for his own incompetence by the risk of losing his case—and being held liable for his opponent's costs and fees—with no one to blame but himself.

 The personal right of access to the courts is at the core of not only the First Amendment right to petition, but also the privileges and immunities and due process guarantees of the United States Constitution and the Fourteenth Amendment. *See Ryland v. Shapiro,* 708 F.2d 967, 971–72 (5th Cir.1983) (citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609; *Chambers v. Baltimore & Ohio*

*R.R.*, 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143 (1907)) (other citations omitted). We find the state's interest in protecting incompetent attorneys from themselves insufficiently compelling to warrant infringing that right. Thus, we reject the proposition that an attorney lacks the First Amendment right to petition through pro se litigation simply because he is doing so in a representative capacity.

### 2. The State's General Interest in Regulating Pro Se Attorney Litigation Conduct

The OARC nevertheless contends in general terms that attorneys are entitled to a lower standard of First Amendment protection of the right to petition pro se solely by virtue of the state's interest in regulating lawyers. But a state's *general* interest in regulating attorneys will not justify disciplinary intrusions on an attorney's First Amendment rights. *See, e.g., Bates,* 433 U.S. at 367–79, 384, 97 S.Ct. 2691 (holding that the First Amendment precludes disciplining attorneys who truthfully advertise legal services in a newspaper despite the state's numerous vague interests in preventing such activity). Rather, the state must articulate a specific interest in mitigating a "substantive evil" that erodes the goals of "true professionalism" among lawyers. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460–62, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (citing *Bates,* 433 U.S. at 368, 97 S.Ct. 2691) (holding that the First Amendment does not preclude discipline for an attorney's in-person solicitation of business because of the serious risk of fraud, undue influence, and intimidation inherent in such activity) (additional citations omitted).

In light of *Bates,* we cannot properly apply a lower standard of First Amendment right-to-petition protection for attorneys based solely on the state's general interest in regulating attorneys. Such an interest cannot overcome the steadfast adherence by the U.S. Supreme Court to the strict requirement that litigation be both objectively baseless *and* based on a subjectively improper motive to constitute sham litigation unprotected by the First Amendment and thus regulable by government action. The Court recently reaffirmed the two-prong *Professional Real Estate Investors* sham test, holding in *BE & K Construction Co. v. NLRB* that even a subjectively improper retaliatory lawsuit cannot be regulated if it is not also objectively baseless. *See* 536 U.S. 516, 531–33, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002). Because neither the Board nor the OARC can articulate any specific compelling interest in regulating attorney conduct that would warrant the application of a different standard, we conclude that the two-prong *Professional Real Estate Investors* sham test must be satisfied to impose discipline on attorneys for pro se litigation conduct.

### 3. The *POME* Framework and Attorney Discipline

Having considered the substantive application of the First Amendment right to petition to attorney discipline, we turn to the procedural protections of that right articulated in *POME.* The requirement of *POME*— that a civil abuse-of-process plaintiff make a prima facie showing that the defendant's underlying litigation is not protected by the First Amendment—is a due process protection implemented to ensure that the defendant's right to petition cannot be chilled by unsupported allegations that the litigation is a sham. *Krystkowiak,* 90 P.3d at 865; *POME,* 677 P.2d at 1368. Here, however, the PDJ ruled that *POME* is inapplicable in the context of pro se attorney discipline simply because *POME* "arose out of a motion to dismiss in a *civil proceeding* rather than a motion to dismiss in a *disciplinary proceeding* " (emphasis in original).

We find this cursory distinction unavailing. An attorney in a disciplinary proceeding is no less entitled to procedural due process than an ordinary civil litigant. *In re Egbune,* 971 P.2d 1065, 1072 (Colo.1999) (citing *People v. Varallo,* 913 P.2d 1, 3–5 (Colo. 1996)); *cf. Green,* 11 P.3d at 1084–85 (invoking the same standard for applying the First Amendment in a civil defamation case, articulated in *N.Y. Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, in the context of an attorney discipline case). Moreover, C.R.C.P. 251.18(d) plainly requires that attorney discipline proceedings, beginning with

the filing of a formal complaint by the OARC, "be conducted in conformity with ... the practice in this state in the trial of civil cases," unless otherwise specified in the Colorado Rules of Civil Procedure. The well-established practice in this state in the trial of civil cases is to require a *POME* showing that the First Amendment is inapplicable in response to a motion to dismiss an abuse-of-process claim. The Rules make no specification that a *POME* showing is unnecessary simply because the OARC, rather than an ordinary civil litigant, is charging an attorney acting pro se with abuse of process.

Nevertheless, the PDJ further concluded that the requirements of C.R.C.P. 251.11 and 251.12—essentially, that the OARC conduct an investigation into the attorney's conduct and obtain authorization from the ARC to file charges by making a prima facie showing of misconduct—so thoroughly guarantee that the attorney's First Amendment right to petition is inapposite prior to the filing of formal charges that a *POME* showing is entirely duplicative, redundant, and unnecessary in a pro se attorney discipline proceeding. Again, we disagree.

While we acknowledge the importance of the diligent investigation by the OARC and the consideration of charges by the ARC in ensuring the due process rights of lawyers accused of misconduct, *see In re Trupp*, 92 P.3d 923, 930 (Colo.2004), the roles of the OARC and the ARC are akin to that of the prosecutor and the grand jury, respectively, in a criminal case. That a prosecutor has investigated a defendant's alleged criminal activity, and that a grand jury, based on the results of that investigation, has indicted the defendant, by no means guarantees that a defendant's conduct is not protected by the First Amendment. *See, e.g., Watts v. United States*, 394 U.S. 705, 707–08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).[12] Similarly, we find no reason to suspect that the OARC's investigation and the ARC's authorization to file charges provide a sufficient guarantee that an attorney's alleged pro se misconduct is unprotected by the First Amendment.

Furthermore, we are unpersuaded by the PDJ's conclusion that attorneys are afforded a meaningful opportunity to assert a First Amendment defense prior to the OARC filing a formal complaint. Although C.R.C.P. 251.10(a) conceivably permits an attorney to present a First Amendment defense to the OARC for consideration during the OARC's investigation, the OARC is under no particular obligation to present the attorney's arguments to the ARC, the PDJ, or the Board if the OARC disagrees, as in this case, that the First Amendment protects the attorney's conduct. Moreover, the ARC is not accountable to the attorney for its failure to consider First Amendment issues sua sponte. *Cf. People v. Trupp*, 51 P.3d 985, 992 (Colo.2002) (holding that ARC members are not subject to sanction under C.R.C.P. 11(a) for the OARC's decision to file a deficient complaint).

The pre-complaint investigation and approval process undertaken by the OARC and the ARC simply serves a gatekeeping function, ensuring that some reasonable basis exists for the OARC to file charges against an attorney. *See* C.R.C.P. 251.12(e)(1). It is not designed to vindicate complex pre-hearing issues of constitutional law, which are better resolved by a neutral and detached magistrate to whom a defendant may formally present legal argument on his own behalf. This function is expressly reserved to the PDJ under C.R.C.P. 251.18(b)(2) and must be performed accordingly.

Because the First Amendment and due process concerns underlying *POME* are equally applicable in the context of pro se attorney discipline as they are in a civil case and are not sufficiently vindicated by the pre-complaint investigative process, we conclude that the OARC, when charging an at-

---

12. The defendant in *Watts* was investigated and indicted for allegedly threatening the life of the President of the United States in violation of 18 U.S.C. § 871 (1964), and moved to dismiss the indictment prior to trial on the grounds that his allegedly threatening speech was protected by the First Amendment. *Watts v. United States,* 402 F.2d 676, 677–78 (D.C.Cir.1968). Notwithstanding the investigation and indictment, the U.S. Supreme Court agreed with the defendant that his speech was indeed protected by the First Amendment and ordered his acquittal. *Watts,* 394 U.S. at 707–08, 89 S.Ct. 1399.

torney with abusive pro se litigation conduct, must make a sufficient showing in response to the attorney's motion for summary judgment that the conduct was not protected by the attorney's First Amendment right to petition.

We note, however, that the *POME* framework need not be applied in an attorney discipline proceeding in precisely the same manner as in a civil litigation. Under *POME,* an abuse-of-process plaintiff must make a prima facie showing that the defendant's underlying litigation (1) was objectively baseless, (2) was based on a subjectively improper motivation, and (3) had the potential to adversely affect a legal interest of the plaintiff. 677 P.2d at 1369. The state's interest in protecting the public from unscrupulous attorneys is always implicated by an attorney's engagement in sham litigation conduct. Accordingly, a sufficient showing of objectively baseless and subjectively improper conduct presumptively obviates the need for the OARC to independently assert a legal interest to satisfy *POME*'s third prong in an attorney discipline proceeding.

Bearing in mind this framework, we turn to the applicability of the First Amendment right to petition to the specific conduct and proceedings at issue in this case. In the proceeding below, the Board imposed sanctions for two distinct instances of alleged misconduct on Foster's part: (1) that his aggregate conduct over the entire course of his litigation against Nunn constituted conduct prejudicial to the administration of justice in violation of Colo. RPC 8.4(d); and (2) that his conduct in his sixth appeal to the court of appeals was sufficiently frivolous to constitute a violation of Colo. RPC 3.1 and 8.4(d). Because the two sets of sanctions implicate the First Amendment in different ways with respect to each theory of misconduct, we address them separately here.

## C. Aggregate Conduct Prejudicial to the Administration of Justice

■■■■■ With respect to Foster's aggregate conduct over the course of the litigation, the Board found that a large majority was either non-frivolous, or that insufficient evidence existed to conclude that it was frivolous. Moreover, the Board did not find that Foster's litigation campaign as a whole was frivolous or otherwise objectively baseless. Thus, even if the sham exception to the First Amendment supports a "mosaic" theory—namely, that several discrete instances of non-baseless conduct can collectively rise to the level of baselessness[13]—that theory did not form the basis for the Board's conclusions. Accordingly, we find no basis in the Board's findings to conclude that Foster's aggregate conduct was sufficiently non-frivolous to satisfy the objective prong of the sham exception to the First Amendment. The fact that litigation conduct is not objectively baseless ends our inquiry, and we do not further consider a litigant's subjective motivation. *See Prof'l Real Estate Investors,* 508 U.S. at 60–61, 113 S.Ct. 1920 (holding that consideration of the subjective prong of the sham exception is improper if the objective prong is not first satisfied).

Even if we were to consider Foster's subjective motivation, however, the Board's findings in this case do not support its conclusion that Foster's aggregate conduct was motivated by a desire to vex, control, and harass Nunn—a largely perfunctory conclusion unsupported by specific evidence that Foster actually desired to do so. The Board primarily based its ruling on seemingly benign attributes of Foster's conduct, such as choosing to represent himself, appealing issues requiring an abuse-of-discretion standard of review, filing several appeals, "over relying on legal citations," introducing exhibits, and engaging in a "precise" and "exhaustive[ ]" form of advocacy.[14] The Board also rested its con-

---

**13.** *Cf. Prof'l Real Estate Investors,* 508 U.S. at 73, 113 S.Ct. 1920 (Stevens, J., concurring in the judgment) (inferring a mosaic-like theory of liability for the repetitive filings held to be illegally anticompetitive in *Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609); *United States v. Maynard,* 615 F.3d 544, 561–62 (D.C.Cir.2010) (approving of a similar mosaic theory in the context of suppress-

ing government surveillance under the Fourth Amendment).

**14.** The OARC's brief echoes many of these seemingly benign concerns, asserting in a section entitled "Facts Relevant to Culpability" that Foster, among other things:

clusion on other attributes of Foster's litigation that, while unfortunate, would aptly describe many dissolution cases: a lengthy, hotly contested, expensive, and emotional action motivated at its core by animosity between parties who may be suffering from emotional turmoil.[15]

While this constellation of attributes, viewed together, might have supported an inference that Foster intended to vex or harass Nunn, that possibility is wholly undercut by the Board's finding of Foster's belief that he was using legitimate legal arguments and factual assertions for the purpose of securing favorable legal relief. More specifically, the Board found that Foster "truly believe[d] that he had strong legal and factual arguments for all of the litigation he initiated." This finding does not support the Board's conclusion that Foster sought to vex Nunn by embroiling her in endless litigation without regard to the result, nor does Foster's largely uncontroverted testimony at the disciplinary hearing.

In sum, the Board's decision reflects not that Foster truly sought to abuse the dissolution process to vex Nunn, but that he simply should have given up because his arguments were wrong, despite his belief in the legal basis for his assertions. While the pursuit of losing arguments may not be a recipe for success, neither does it bear the hallmark of punishable or necessarily undesirable litigation conduct. *See BE & K Constr.*, 536 U.S. at 532, 122 S.Ct. 2390 (citing *Prof'l Real Estate Investors*, 508 U.S. at 58–61, 113 S.Ct. 1920; *Pennington*, 381 U.S. at 670, 85 S.Ct. 1585; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)) ("[O]ur prior cases ... have protected petitioning whenever it is genuine, not

- Engaged in litigation that "lasted for years";
- "[A]ppealed the Magistrates' rulings";
- "[F]iled requests for reconsideration and motions to set aside judgments";
- "[F]iled and briefed seven appeals of the district courts' rulings to the Court of Appeals";
- "[F]iled petitions for writs of certiorari"; and
- "[M]oved to recuse [a magistrate]."

simply when it triumphs.... [T]he text of the First Amendment [does not] speak in terms of successful petitioning.... [E]ven unsuccessful but reasonably based suits advance some First Amendment interests.").

Because neither the Board's findings nor the record support a conclusion that Foster's aggregate conduct satisfied either the objective or subjective prongs of the sham exception, we hold that the conduct was therefore protected by Foster's First Amendment right to petition. We further hold that the Board erred by failing to require the OARC to make a prima facie showing under *POME*, in response to Foster's motion for summary judgment, that Foster's aggregate conduct was not protected by the First Amendment. Accordingly, we dismiss the charges that Foster violated Colo. RPC 8.4(d) by engaging in aggregate conduct through the course of his litigation with a cumulative effect prejudicial to the administration of justice.

### D. Foster's Sixth Appeal

The Board concluded that Foster violated Colo. RPC 3.1 and 8.4(d) twice in filing his sixth appeal by reasserting claims from earlier appeals that: (1) the district court improperly valued Nunn's marital assets; and (2) that the district court judge should have been disqualified for bias.

Unlike with Foster's aggregate conduct, the Board made specific findings that Foster's conduct in his sixth appeal was objectively baseless. The Board, however, again made only summary and perfunctory conclusions that Foster had a subjectively improper motivation for his conduct, despite concluding that Foster genuinely believed that he was engaged in a legitimate effort to obtain favorable relief. These conclusions seem based

15. The Colorado Practice Series notes that similar cases often lead to unfounded disciplinary complaints:

Domestic relations cases are a common source of disciplinary complaints and claims of malpractice, not because the attorneys who handle them are unethical or careless, but because of the *nature of the cases themselves*. Given the *emotional turmoil inherent in a dissolution*, few, if any, clients are completely content with the dissolution process or the results reached.

19 *Colo. Prac., Family Law & Practice* § 2:1 (2d ed. 2009) (emphasis added).

largely on the alleged baselessness of Foster's conduct rather than any specific evidence of his subjectively improper motivation.

■ We acknowledge that the baselessness or frivolousness of an argument can support a circumstantial inference that the argument was subjectively motivated by an improper desire to ensnare an opposing litigant in the process of the argument's resolution. We are reluctant, however, to make such an inference, particularly in the face of evidence of a litigant's genuine desire to secure favorable relief, unless the litigant's argument is so wholly devoid of conceivable merit that the litigant's proffer of proper motivation has no credibility.[16]

### 1. The Valuation Issue

With respect to Foster's reassertion of the valuation issue in his sixth appeal, we cannot conclude that his arguments were so entirely meritless that he must have had a subjectively improper motivation for asserting them. From the record before us, it appears that Foster initially argued in his first appeal that the district court's use of so-called "minority discounts" to value some of Nunn's property was improper. The court of appeals affirmed the district court's application of minority discounts, but ordered a redivision of marital property on remand.

The district court apparently informed Foster that it would not revalue the property to which it had applied the minority discounts for the purposes of the property redivision. The district court nevertheless proceeded to revalue the property for the purpose of determining the parties' economic circumstances, reapplying the minority discounts in the process. Foster then sought to assert the impropriety of the minority discounts to the revaluation of the property in the context of the district court's reconsideration of the parties' economic circumstances, arguing that the trial court had failed to properly consider Nunn's failure to sell the property since the dissolution, which he contended rendered the reapplication of the discounts improper.

■ While we agree with the Board that Foster was on notice from the court of appeals that it was within the district court's discretion to apply the minority discounts in the context of the property's valuation for the purposes of the property redivision, the tenor of Foster's sixth appeal was that the district court was doing so in an entirely new context—the re-evaluation of the parties' economic circumstances. While the argument rested upon a similar line of reasoning to that of the argument in the first appeal, it was not so obviously duplicative of the first argument to support an inference, without more, that Foster must have asserted it for no other reason than to waste Nunn's time and money by forcing her to respond. While we do not dispute the Board's finding that the argument was baseless, we cannot conclude that it was so lacking in merit that Foster's proffered motivation for asserting it—namely, to win a favorable ruling on a critical issue in his case—was so wholly unbelievable or incredible that it could not have been true as a matter of law.[17]

Accordingly, we hold that Foster's reassertion of the valuation issue in his sixth appeal was protected by his First Amendment right to petition, and that the Board again erred by failing to require the OARC to make a prima facie showing under *POME*, in response to Foster's motion for summary judgment, that the assertion was not protected by the First Amendment. Accordingly, we dismiss the charges that Foster violated Colo.

---

16. This principle is particularly important in a dissolution case, where it may be tempting to infer a subjectively improper motivation from litigants' actions simply because they harbor deep and obvious animosity for each other—despite the fact that the animosity may form the very basis for the case. See discussion *supra*, note 15.

17. This holding in no way bears on the court of appeals' conclusion that the appeal was sufficiently frivolous to order Foster to pay Nunn's costs and fees. *See BE & K Constr.*, 536 U.S. at 537, 122 S.Ct. 2390 (the First Amendment does not undermine "common litigation sanctions imposed by courts themselves ... or the validity of statutory provisions that merely authorize the imposition of attorney's fees on a losing plaintiff").

RPC 3.1 and 8.4(d) by reasserting the valuation issue during his sixth appeal.

## 2. The Bias Issue

We reach a different conclusion with respect to Foster's reassertion of the bias issue in his sixth appeal. Based on the record, it appears that Foster asserted in his fifth appeal that the district court judge presiding over his case was biased against Foster and erred by failing to disqualify himself sua sponte. The court of appeals held that Foster had waived the bias claims by, among other things, failing to file a C.R.C.P. 97 recusal motion. The court also broadly rejected the substance of Foster's bias claims, concluding notwithstanding the waiver that there was no evidence of bias.

Foster then filed a C.R.C.P. 97 motion, which the district court denied, and then filed his sixth appeal, in which he again contended that the district court judge failed to disqualify himself sua sponte for many of the same reasons asserted and rejected in Foster's fifth appeal. Unlike the valuation issue, this was not a situation where new circumstances or new evidence could possibly have led to a different result; Foster simply asserted the same arguments to the same court for a second time.

Given the court of appeals' ruling in the fifth appeal that the arguments were not only meritless, but also frivolous and vexatious, we find Foster's proffered motivation for reasserting them dubious. Given the overall sophistication of Foster's arguments throughout the litigation below, Foster's suggestion that he honestly believed he could obtain favorable legal relief by flatly reasserting arguments already deemed frivolous, and for which he had already been ordered to pay Nunn's attorney fees, is implausible. Rather, as Foster himself admitted at the disciplinary hearing, he believed prior to filing the appeal that the court of appeals was "tired of hearing from [him]" and "[was] not going to rule in [his] favor no matter what the law."

While Foster may have genuinely believed that the district court judge was biased against him, he reasserted that issue on appeal without any subjectively proper motivation of obtaining favorable relief. Accordingly, we conclude that his motivation for doing so was subjectively improper as a matter of law.

We further agree with the Board's assessment of Foster's reassertion of the bias issue as objectively baseless. Foster received a fair opportunity to resolve that issue in his fifth appeal, and his failure to obtain a favorable result from the court of appeals or on certiorari review from this court or the U.S. Supreme Court exhausted his bases upon which to challenge the judge's allegedly biased conduct. His subsequent reassertion of precisely the same issue without any reason to expect a different result is the very definition of an objectively baseless claim.[18]

With respect to Foster's contention that the Board improperly considered the opinions of the courts in the underlying litigation in determining the frivolousness of his reassertion of the bias issue, we agree that the Board considered the opinions for the truth of the matter asserted therein when they had not been admitted for such a purpose. For example, the Board admitted the court of appeals' opinion in Foster's sixth appeal for the narrow purpose of considering its effect on Foster—namely, to establish, in connection with the charge that Foster's aggregate conduct violated Colo. RPC 8.4(d), that Foster was aware the court had deemed his sixth appeal frivolous. Yet, the Board specifically quoted from the court of appeals' opinion in support of its conclusion that Foster's con-

---

**18.** While we express no opinion as to whether the district court judge was in fact biased against Foster, we note Foster's apparently uncontroverted testimony at trial that an assistant regulation counsel told him just prior to filing his sixth appeal: "There is no chance that [the district court judge] is going to be ruling in your favor.... He perceives you as being a problem, and he's just ... not going to approach these hearings objectively." This statement, if true, is troubling in light of the OARC's characterization of Foster's claims of bias as "misguided" and "frivolous" in its brief to this court. Nevertheless, tacit agreement from the OARC that the district court judge was biased against Foster is neither evidence of the judge's bias nor an objectively reasonable basis for reasserting an already rejected argument.

duct was frivolous—a plain consideration of the opinion for the truth asserted therein.

We need not reach, however, whether the Board's consideration constituted . error, harmless or otherwise. There is sufficient evidence to conclude that Foster's reassertion of the bias issue was frivolous in Foster's briefs in his fifth and sixth appeals, of which he stipulated to unconditional admission, and in the court of appeals' fifth opinion, which we consider only for its admitted purpose: to establish Foster's understanding that the court rejected his arguments and deemed them frivolous, and that he could obtain no further relief on the issue other than through certiorari review. Because the evidence was sufficient to support a finding of frivolousness regardless of the truth of the matter in any of the court of appeals' opinions, we also need not address Foster's contention that Board's consideration thereof constituted a burden-of-proof error under *Colorado Dog Fanciers, Inc. v. City & County of Denver ex rel. City Council,* 820 P.2d 644 (Colo.1991).

Because Foster's reassertion of the bias issue in his sixth appeal was both objectively baseless and subjectively motivated by an improper purpose as a matter of law, we conclude that it was not protected by his First Amendment right to petition regardless of his status as an attorney.

We again acknowledge that the Board erred by failing to require the OARC to make a prima facie showing under *POME,* in response to Foster's motion for summary judgment, that Foster's reassertion of the bias issue was not protected by the First Amendment. Nevertheless, we conclude that the error was harmless. Under C.R.C.P. 61, an erroneous denial of summary judgment will not serve as a basis for reversal unless it affects the substantial rights of the moving party. *Swan v. Zwahlen,* 131 Colo. 184, 187, 280 P.2d 439, 441 (1955). The OARC's response to Foster's motion contained a copy of the OARC's investigative report, which included more than sufficient evidence to permit the PDJ to reasonably conclude that Foster's bias claims were not protected by the First Amendment. Thus, the PDJ's failure to apply *POME* with respect to Foster's bias claims was harmless.

Finally, we reject Foster's contention that he can only be disciplined for his entire sixth appeal, or not at all, under the court of appeals' holding in *Ware v. McCutchen,* 784 P.2d 846 (Colo.App.1989). An attorney cannot shield his misconduct by pointing to his legitimate activities any more than a "plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Cf. Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.1936). Just as we cannot use Foster's misconduct in this limited context as a basis to condemn his entire litigation, we cannot point to the Board's failure to find a broader pattern of illegitimacy to excuse Foster from responsibility for bringing a plainly frivolous claim with no good legal reason to do so.

Accordingly, we affirm the Board's conclusion that Foster violated Colo. RPC 3.1 and 8.4(d) by asserting a frivolous claim of bias in his sixth appeal, which constituted conduct prejudicial to the administration of justice.

### III. Conclusion

By clothing some of Foster's conduct "with the mantle of the First Amendment," we neither condone it nor express any opinion with respect to the veracity of his arguments in the underlying litigation. *See Green,* 11 P.3d at 1087. We also acknowledge that the dissolution process often takes a great emotional and financial toll on families, and we are sympathetic to the suffering and expense imposed on Nunn in this case by the length of the litigation. Nevertheless, the First Amendment simply does not permit us to impose professional discipline on Foster for engaging in non-sham litigation.

Accordingly, we dismiss the OARC's charges that Foster's aggregate conduct violated Colo. RPC 8.4(d) and that his reassertion of the valuation issue in his sixth appeal violated Colo. RPC 3.1 and 8.4(d), and affirm the Board's conclusion that Foster's reassertion of the bias claim in his sixth appeal violated Colo. RPC 3.1 and 8.4(d). Because the Board did not apportion sanctions between the aforementioned violations, we remand for a redetermination of appropriate

sanctions for Foster's single violation of Colo. RPC 3.1 and 8.4(d).